

U.S. Department of Justice

*United States Attorney
Eastern District of New York*

CCC:MRM
F. #2017R01349

*610 Federal Plaza
Central Islip, New York 11722*

April 28, 2023

<u>By ECF and Email</u>

The Honorable Gary R. Brown
United States District Judge
Eastern District of New York
940 Federal Plaza
Central Islip, New York 11722

    Re: United States v. Daniel Mullan
      <u>Criminal Docket No. 17-495 (GRB)</u>

Dear Judge Brown:

  The government respectfully submits this letter in advance of the defendant Daniel Mullan's sentencing, which is scheduled for May 15, 2023. For the reasons set forth below, the government respectfully requests that the Court impose a sentence of 360 months' imprisonment, five years' supervised release, criminal forfeiture, restitution and sex offender registration as required by 18 U.S.C. § 4042(c).[1]

 I. <u>Factual Background</u>

  A. <u>The Defendant's Guilty Plea</u>

  On November 21, 2022, the defendant, Daniel Mullan ("Mullan" or "defendant") pleaded guilty before the Court to Count One and Count Four of the above-captioned indictment charging the defendant with sexual exploitation of a child and possession of child pornography, in violation of 18 U.S.C. §§ 2251(a)(1) and 2252(a)(4)(B), respectively. PSR at ¶¶ 1-3. The defendant plead guilty to those counts pursuant to a plea agreement with the government.

---

[1]  The United States Probation Department ("Probation") issued its Presentence Investigation Report (hereinafter "PSR") on February 23, 2023. In conjunction with the PSR, Probation issued its Sentence Recommendation. In that recommendation, Probation asks the Court to impose a term of 20 years' imprisonment on Count One, and a consecutive term of 10 years' imprisonment on Count Four, for a total term of 30 years' imprisonment.

B. <u>The Defendant's Criminal History</u>

As set forth in the PSR, at ¶ 127,[2] the defendant has one prior conviction arising from his years' long course of sexual assault of a minor in Ireland.[3] The defendant's criminal conduct in that case began when the victim was 11 years-old in 2000. The defendant's criminal conduct, which included multiple instances of production of child pornography, buggery and sexual assault involving the minor male victim, took place over the course of several years from 2000 to approximately 2005. The defendant's conduct in that case can be accurately described as an ongoing pattern of rape. <u>Id.</u> In 2013, Irish authorities enlisted the assistance of the United States Marshals Service ("USMS") in attempting to locate the defendant. The USMS was able to quickly locate the defendant at his residence at 142 Wellington Road, in Elmont, New York. PSR at ¶¶ 7 and 127. In January 2014, the USMS was again enlisted to assist in the execution of an arrest warrant for the defendant, issued in connection with his extradition to Ireland for being a fugitive of the Republic of Ireland. <u>Id.</u> The defendant was subsequently convicted and sentenced on June 14, 2016, to a term of eight and one-half years' custody by the Irish District Court for Beal an Mhuirthead, Ireland. PSR at ¶ 127. That sentence was subsequently reduced, following an appeal, to five years' custody. <u>Id.</u>

It was while the defendant was in custody in Ireland in connection with the above-described sex offense against a minor that the full scope of his decades' long child exploitation and child pornography production crimes began to come to light.

C. <u>The Instant Criminal Conduct</u>

As outlined in the PSR, in 2014, after the defendant was extradited from the United States and while pending trial in connection with his sex crimes against a minor in Ireland, the defendant contacted an individual in the United States, John Doe 2, and asked John Doe 2 to, in essence, serve as a caretaker for the defendant's property in the United States while the defendant was in custody in Ireland. PSR at ¶ 11. In 2017, after recalling an incident from years prior in which the defendant induced John Doe 2 (who was fifteen or sixteen years old at the time) to undress and masturbate while the defendant filmed him (PSR at ¶ 10), John Doe 2 went to the defendant's Elmont, New York residence to locate the videotape that the defendant had made of him. PSR a ¶ 12. While searching the defendant's residence for a video of himself, John Doe 2 found over a half-dozen videotapes of minor boys, most of which depicted the defendant engaging in sex acts with boys between the ages of 12 and 15, some of which appeared to be several decades old. John Doe 2 also found a box of polaroid photographs of nude 16-year-old boys. <u>Id.</u> After finding these recordings of the defendant's heinous crimes

---

[2] Because this was a sentence resulting from a foreign conviction, it does not receive any criminal history points pursuant to Guidelines §4A1.2(h).

[3] While the defendant has no other criminal convictions, the defendant is currently the subject of an arrest warrant issued by a Court in Armonk, New York, related to a 2006 car accident in which the defendant was charged with driving with a suspended license. PSR at ¶ 133.

against children, John Doe 2 called the Federal Bureau of Investigation ("FBI") on June 13, 2017 and told them what he had found and what the defendant had done to him in the past. PSR at ¶¶ 8-12. Upon hearing John Doe 2's story, members of the FBI obtained a search warrant for the defendant's residence in Elmont. PSR at ¶ 13; see also, 17-MJ-541 (ARL), currently filed under seal. On June 16, 2017, members of law enforcement executed the search warrant on the defendant's Elmont residence. PSR at ¶ 14. The results of that search were horrifying.

During the search of the defendant's residence, agents uncovered a massive trove of child pornography, a large portion of which was homemade and depicted the defendant himself engaged sex acts with minor boys. PSR at ¶ 14. The search uncovered large quantities of storage media, including DVDs, VHS tapes, 8mm film, CDs, hard drives and laptops, all of which were found to contain child pornography. Id. While conducting its review of the evidence recovered from the defendant's residence, agents uncovered evidence of a storage unit in Melville, New York, where it appeared that the defendant stored additional child pornography. PSR at ¶ 15. Agents then obtained a search warrant for the storage unit. Id.; see also, 17-MJ-729 (AKT), currently filed under seal. On August 17, 2017, agents executed the search warrant on the defendant's storage unit and uncovered yet another massive stockpile of child pornography, many of the items being homemade, depicting the defendant himself engaging in sex acts with underage boys. Id.

After uncovering this sprawling collection of child pornography and the defendant's self-documented rapes of minor boys, law enforcement began the daunting task of reviewing the huge volume of evidence to determine the scope of the defendant's crimes and to attempt to locate victims of the defendant sexual abuse and exploitation of children. PSR at ¶¶ 16-18. As the agents began conducting their review, it became clear that the defendant has been abusing minor boys and raping children for decades, as they uncovered homemade child pornography involving the defendant himself dating back to the 1980s and continuing through the 2000s. PSR at ¶ 16. The defendant's collection of child pornography took four storage pallets for the agents to warehouse. Id. The defendant's child pornography collection comprised nearly a thousand items, many of which were hours' long videos and much of which depicted the defendant engaging in sex acts and acts of sexual abuse with underage males. Id. Based upon the agents review of the defendant's collection of child pornography, they were able to identify a dozen victims who were abused at the hands of the defendant while they were children. PSR at ¶ 18. Despite the best efforts of law enforcement, agents were unable to determine a total number of child victims of the defendant's heinous conduct. Id.

Of the thirteen of the defendant's victims that were interviewed by the FBI in the instant investigation all recounted similar stories of abuse, exploitation and rape by the defendant while they were underage. [4] Agents were able to identify four different ways in which the defendant would target and groom young boys for sexual abuse at the hands of the defendant. PSR at ¶¶ 19, 39-40, 55 and 66. Because the PSR sets forth the victims' stories of their abuse at

---

[4] Two of the victims, John Doe 3 and John Doe 13, were identified and confirmed to be victims of the defendant based upon videos and images agents observed in the defendant's collection of homemade child pornography. However, when interviewed by law enforcement John Doe 3 and John Doe 13 denied being sexually abused by the defendant.

3

the hands of the defendant in detail, the government will not repeat the harrowing ordeals that the victims suffered ad nauseum, but instead will summarize their accounts.

1. John Doe 1

John Doe 1, who is the victim of Count One of the indictment, reported to law enforcement that he was sexually abused by the defendant for a period of several years beginning in the mid-1990s, when John Doe 1 was approximately 8 or 9 years old until the time that John Doe 1 was approximately 13 or 14 years old. During the course of the defendants sexual abuse of John Doe 1, the defendant regularly recorded or took pictures of himself abusing John Doe 1. Furthermore, the defendant trafficked John Doe 1 across the United States and internationally to accomplish his relentless abuse of John Doe 1. PSR at ¶¶ 39-47.

2. John Doe 2

As set forth above, John Doe 2 described the defendant paying him to undress and engage in a sexual act while the defendant filmed him. John Doe 2 was 15 or 16 years old at the time. PSR at ¶¶ 8-12.

3. John Doe 4

John Doe 4 reported to law enforcement that from age 10 to approximately age 14 or 15, in the early 1990s, he travelled with the defendant domestically and internationally. John Doe 4 reported that while Florida and New York, the defendant slept in the same bed as John Doe 4, took inappropriate pictures of John Doe 4 and sexually abused John Doe 4. Although John Doe 4 was aware of the defendant taking inappropriate photographs of him, he was unaware of the defendant recording any of the sexual abuse the defendant committed against him. PSR at ¶¶ 24-28.

4. John Doe 5

John Doe 5 reported to law enforcement he met the defendant when he was 16 or 17 years old and travelled with the defendant to New York and the Bahamas. John Doe 5 reported that on one occasion, the defendant took him to a hotel room, put on an adult pornographic film, directed him to undress and then sexually assaulted him. PSR at ¶¶ 29-32.

5. John Doe 6

John Doe 6 reported to law enforcement that he first met the defendant when he was 14 years old. John Doe 6 travelled with the defendant to various locations across the United States, and on these trips the defendant would sexually abuse John Doe 6, who was underage at the time of these trips. John Doe 6 detailed to agents that the defendant's abuse of him involved, amongst other acts, the defendant orally and anally raping John Doe 6. John Doe 6 recounted several occasions in which the defendant tried to convince John Doe 6 to engage in sex acts with the defendant's adult friends. PSR at ¶¶ 33-38.

6. <u>John Doe 7</u>

John Doe 7 reported to law enforcement that he first met the defendant in approximately 1994 when he was 14 years old. John Doe 7 reported that he travelled with the defendant to several destinations domestically and abroad. John Doe 7 reported being sexually abused by the defendant over the course of two years when he was approximately 15 years old. Portions of the abuse took place while in the Bahamas with the defendant. John Doe 7 recounted the defendant taking photographs of the sexual abuse he was committing against John Doe 7. John Doe 7 also reported that the defendant gave him alcohol while he was underage and on a separate occasion showed John Doe 7 a firearm he owned. PSR at ¶¶ 48-51.

7. <u>John Doe 8</u>

John Doe 8 reported having known the defendant since he was approximately 3 years old. In the early 2000s, when John Doe 8 was approximately 13 years old, the defendant took John Doe 8 on a trip to abroad. While overseas, the defendant showed the 13-year-old a pornographic magazine and took nude photographs of John Doe 8. The defendant had told John Doe 8 that he had deleted the photographs, however, the defendant showed the same photos to John Doe 8 on a later date. PSR at ¶¶ 52-54.

8. <u>John Doe 9</u>

John Doe 9 reported to law enforcement that he first met the defendant in 1993 or 1994 when John Doe 9 was 14 or 15 years old. The defendant paid for trips for John Doe 9, who lived abroad, to travel to the United States. John Doe 9 denied any photos or videos being taken of him while he was staying with the defendant. However, John Doe 9 reported that on one occasion, he recalled the defendant had attempted to convince John Doe 9 to masturbate in front of him, but he refused. The defendant then attempted to make John Doe 9 believe that something was wrong with him because of his refusal to comply with the defendant's request. John Doe 9 also reported finding pornographic magazines throughout the defendant's Elmont residence. PSR at ¶¶ 56-58.

9. <u>John Doe 10</u>

John Doe 10 reported to law enforcement that beginning in approximately 1992, when John Doe 10 was 11 or 12 years old, the defendant brought John Doe 10 from Ireland to his residence in Elmont, New York and residences of the defendant's relatives in Florida. When John Doe 10 was about 13, the defendant first sexually abused him at a residence in Florida. The defendant subsequently sexually abused John Doe 10 several times at the Elmont residence the defendant recorded the abuse. The defendant also left John Doe 10 at the residence of a friend of the defendant in Elmont, and this friend also sexually abused John Doe 10 by preforming oral sex on him against his will. PSR at ¶¶ 59-65.

10. <u>John Doe 11</u>

John Doe 11 reported to law enforcement that he has known the defendant all of his life, as the defendant was related to his grandmother. John Doe Eleven reported that in 1988 or 1989, when he was approximately 15 or 16 years old, the defendant took him on a trip to Utah

5

and tried to pay John Doe 11 to have sex with an adult man, but John Doe 11 refused. At some point during the course of the trip, the defendant sexually abused John Doe 11. Later, John Doe 11 travelled to New York and stayed with the defendant at the defendant's residence. During this trip, the defendant slept in the same bed as John Doe 11, sexually abused him and attempted to penetrate John Doe 11, but the victim successfully resisted the defendant's attempts to rape him. PSR at ¶¶ 66-72.

        11. <u>John Doe 12</u>

John Doe 12 reported he first met the defendant in 1983 when he was approximately 10 years old. John Doe 12 recounted to the agents that when he was approximately thirteen or fourteen years old, he travelled with the defendant to Florida. While in Florida, the defendant began touching John Doe 12 in his groin area several times. John Doe 12 informed the defendant that he did not like that. John Doe 12 further reported that when he was 13 or 14 years old, he overheard John Doe 13 (who would have been 16 or 17 at the time) talking to the defendant on the phone and John Doe 13 stated that he had performed oral sex on the defendant. PSR at ¶¶ 75-83.

    D. <u>The Arrest and Extradition</u>

During the course of the FBI investigation into the defendant's exploitation of minors in the summer of 2017, authorities in the United States learned that the defendant's sentence in Ireland had been reduced by an Irish appeals court and the defendant was due to be released on or about October 16, 2017. On or about September 7, 2017, a federal grand jury sitting in the Eastern District of New York returned the above-captioned indictment and the Honorable Arlene R. Lindsay, United States Magistrate Judge, Eastern District of New York, issued a warrant authorizing the defendant's arrest. Thereafter, on or about October 13, 2017, the United States submitted a request to Ireland for the extradition of the defendant to the United States. On October 16, 2017, the defendant was released from Irish prison as scheduled and later that day was arrested by Irish authorities pursuant to the extradition request. At the time of his arrest, the defendant was found in possession of airline tickets to Dubai in the United Arab Emirates, a nation without an extradition treaty with the United States. The defendant attempted, unsuccessfully, to contest his extradition from Ireland to the United States for several years. Ultimately, Ireland granted the United States' extradition request, and the defendant was transferred to the custody of the FBI on August 16, 2019. PSR at ¶¶ 84-86 and 158.

II.    <u>Guidelines Calculation</u>

On February 22, 2023, Probation issued the PSR in this case. In calculating the applicable total offense level, Probation determined that the defendant's criminal conduct yielded a total offense level of 43. PSR at ¶¶ 96-125. Probation also determined that the defendant, despite his relatively recent criminal convictions for sexual offenses against a minor in Ireland (PSR at ¶ 127), falls within Criminal History Category I. PSR at ¶¶ 128-129. Based upon an offense level of 43 and a Criminal History Category I, the Guidelines range of imprisonment is life. PSR at ¶ 168. However, because the statutory maximum for Count One is twenty years' imprisonment and the statutory maximum for Count Four is ten years' imprisonment, the restricted Guidelines term of imprisonment is 360 months' or 30 years' imprisonment. <u>Id.</u> The

government agrees with the Guidelines calculation as set forth in the PSR. Indeed, the same Guidelines calculation was included in the government's Guidelines estimate contained in the defendant's plea agreement.

III.     Analysis

Congress has instructed that when fashioning a sentence, a court shall impose a sentence that is sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2) and in determining the particular sentence to be imposed, the court shall consider the nature and circumstances of the offense and the history and characteristic of the defendant. See 18 U.S.C. § 3553(a). Here, the relevant 3553(a) factors call for a sentence of 30 years' imprisonment, the maximum allowed under the applicable statutes.

First, the nature and circumstances of the offenses of conviction (18 U.S.C. § 3553(a)(1)) clearly call for the imposition of the maximum allowable sentence. The offenses of which the defendant stands convicted are amongst the most serious criminal offenses a person can commit. The defendant's crimes victimized at least a dozen minors in life altering ways. These were crimes that ruined lives for the defendant's financial gain and sexual gratification. In short, his crimes are utterly horrific. The history and characteristics of the defendant (18 U.S.C. § 3553(a)(1)) also calls for the maximum allowable sentence. The defendant, for at least three decades, was a hands-on child pornography producer. It is undisputable that the defendant was a sex trafficker and a for profit rapist of young boys.

Turning to the need for the sentence to reflect the seriousness of the offense, promote respect for the law and to provide just punishment for the offense (18 U.S.C. § 3553(a)(2)(A)), it is clear that a 30-year prison sentence is required to satisfy this 3553(a) factor. The seriousness of the defendant's offense, raping children over the course of decades, cannot possibly be understated. In order to promote respect for the law, specifically the laws prohibiting crimes against the sexual exploitation of children, the maximum allowable sentence is called for in this case. Finally, the maximum allowable sentence is required to ensure that the defendant receives just punishment for his crimes. This defendant was not held accountable for his horrific crimes until he was in his late 70s, early 80s. A 30-year prison term will likely be a life sentence for the defendant. While a sentence of life is not statutorily available, the Guidelines call for a life sentence and a 30-year sentence will be akin to a life sentence. Accordingly, a 30-year prison term will ensure this factor is adequately addressed.

To the extent that a sentence should provide adequate deterrence to criminal conduct (18 U.S.C. § 3553(a)(2)(B)), a 30-year sentence will certainly achieve specific deterrence, as it will prevent this defendant from ever victimizing a child again. Similarly, to achieve general deterrence the Court must impose a sentence that sends the message to the public that perpetrating a decades long pattern of sexual abuse and rape of minor children will not be tolerated. To send that message, the Court should impose the maximum allowable term for these most serious of offenses. In this case, the Court should impose a 30-year prison term to ensure adequate deterrence, both general and specific.

Here, the need to protect the public from future crimes of the defendant (18 U.S.C. § 3553(a)(2)(C)), while of lesser relevance due to the defendant's advanced age and ill

health, nevertheless calls for a substantial sentence to ensure that the defendant will never again be at liberty to attempt to victimize a child or indulge his desire to rape children. A term of 360 months' imprisonment will certainly ensure the protection of the public from the defendant's criminal proclivities.

The need for the Court to consider educational, vocational or correctional treatment (18 U.S.C. § 3553(a)(2)(D)) is inconsequential here. It is respectfully submitted that due to the defendant's advanced age and life of vile sexual abuse of minors, the defendant is most assuredly beyond rehabilitation. In this case, the need to fashion a sentence that provides the defendant with needed medical care is readily addressed by the Court recommending to the Bureau of Prisons ("BOP") that the defendant serve his extended imprisonment term at an FMC, or Federal Medical Center, within the BOP system.

When the Court considered the kinds of sentences available (18 U.S.C. § 3553(a)(3)) and the sentence range established by the guidelines (18 U.S.C. § 3553(a)(4)), those factors also clearly support the imposition of the maximum allowable sentence. Count One, sexual exploitation of a minor, based upon the version of the statute in effect at the time of the defendant's crime, has a statutory minimum term of 10 years' imprisonment and a maximum of 20 years.[5] Count Four carries a maximum term of 10 years' imprisonment. Here, the applicable guidelines range for Count One and Count Four is life, which clearly supports the imposition of a prison term of 30 years, which is also the restricted range based upon the applicable statutory maximums. Similarly, a 30-year term of imprisonment will avoid unwarranted disparities (18 U.S.C. § 3553(a)(6)) as individuals who engage in the sexual abuse of children and produce child pornography are regularly sentenced to terms far more than 30 years.

Finally, to address the need to provide restitution to any victims (18 U.S.C. § 3553(a)(7)), the government respectfully requests that the Court order the restitution requested by the victim John Doe 10 in their affidavit of loss submitted to Probation. PSR at ¶ 183.

IV.   Conclusion

Based upon the facts and circumstances in the instance case, a sentence of 30 years' (360 months) imprisonment to be followed by the required 5 years of supervised release, including the sex offender registration requirements, and imposing the restitution requested by the victims, the mandatory assessments and criminal forfeiture as agreed to by the defendant in

---

[5]   By comparison, were the defendant to commit the same offense today, he would face a minimum term of 15 years' imprisonment and a maximum term of 30 years' imprisonment.

his plea agreement, is a sentence that is sufficient, but not greater than necessary, to achieve the goals of sentencing outlined in 18 U.S.C. 3553(a).

                                        Respectfully submitted,

                                        BREON PEACE
                                        United States Attorney

By:    /s/ Michael R. Maffei
            Michael R. Maffei
            Assistant U.S. Attorney
            (631) 715-7890

cc:    Nancy L. Barling, Esq. (counsel to defendant) (by ECF and email)
       U.S.P.O. Frank Nikolaidis (by email)